## THE SALMON FALLS MANUFACTURING COMPANY *v.* THE PORTS-MOUTH COMPANY & SAMUEL HALE.

In construing a written agreement the court will not only look at the surrounding circumstances, but will read the preliminary agreement as well as the papers referred to in the agreement to be construed, with a view to discover the intention of the parties, and the sense in which terms apparently ambiguous or inconsistent were used by them.

If with such aids the leading scope and purpose of the parties can be ascertained, too much stress will not be laid upon the precise meaning of particular words or clauses, where they come in conflict with the leading object of the agreement; but they will receive, if they may, such a construction as will best accomplish and carry out the primary and leading intention of the parties.

Where, from the whole instrument read in the light of the surrounding circumstances, and of the preliminary and other agreements referred to, it is apparent that it was the purpose of the parties that the plaintiff should sell to the defendant corporation the right to maintain a dam to the height of certain iron bolts; but in making the conveyance, after a grant of that right, there was also a license to raise the water to the height of such bolts, it was *held* that the latter clause was not to be construed under the circumstances, as a limitation of the height of the dam, but that the grantee acquired the right to maintain a dam of that height, and to use it in the ordinary way, although it would sometimes raise the water above such bolts.

Where, by the preliminary agreement, a right was sold to raise a dam to a certain height above another dam, and afterwards by an instrument in writing the parties agreed that certain iron bolts were placed in the rocks to denote the height to which the vendees had the right to raise their dam by virtue of such preliminary agreement, which second agreement was made part of the final instrument of conveyance—*held* that this was conclusive evidence of the height to which the grantees might build their dam.

Where, by the preliminary agreement, the right to raise the dam was to be conveyed, and also so much land as should be flowed or damaged by such dam, to be finally adjusted when the dam was so raised, the price of such land to be one hundred and fifty dollars per acre; and the right to raise the dam and to flow grantor's land was afterwards conveyed, but not the land itself—*held* that the agreement to take and pay for the land was not necessarily merged in this conveyance, but that, under the circumstances, plaintiffs were entitled to a specific performance.

THIS is a bill in equity brought by the Salmon Falls Manufacturing Company against the Portsmouth Company, and Samuel Hale, the agent of the latter company. It is brought to compel the Portsmouth company to reduce its dam at Quamphegan, erected in 1861, so that it shall raise the water in the Salmon Falls river no higher than certain iron bolts; alleging that it does now raise it much higher to the plaintiff's injury; and also to compel the defendants to take and pay for the land of the plaintiffs flowed or damaged by such dam of the defendants, according to the agreement between the parties.

The plaintiffs' claim is based upon the several agreements set forth in the bill, copies of which agreements are here given. The dam at Quamphegan existing in September, 1839, remained and was used with flash boards until 1861, when the dam complained of was erected. In respect to the height of the dam the great question between the parties is, whether defendants under the agreements have the right to raise their dam to the height of the iron bolts, or only so as to cause the water to flow to that height.

All other material facts sufficiently appear in the opinion of the court.

### *Copies of agreements between the parties:*

The undersigned, directors in the Portsmouth Company, hereby agree to purchase for said company, the lower privilege and field at Salmon

Falls, and to pay therefor at such price as may be mutually agreed upon by John Haven, Esq., and Samuel Lord.

September 3, 1837.

SAMUEL HALE,
ICHABOD ROLLINS,
THEO. F. JEWETT,
JOSIAH W. SEAVER,
THOMAS JEWETT,
WILLIAM STAVERS.

It is agreed that the Portsmouth Company purchase.of the Salmon Falls Manufacturing Company, eleven feet of the lower Salmon Falls, according to the perpendicular scale on Mr. Peirce's profile plan, or five feet and two inches above the water on the present flash board at Quamphegan, for the sum of five thousand three hundred and forty-eight dollars.

It is also further agreed that the Salmon Falls Manufacturing Company sell and convey to the Portsmouth Company, the land belonging to them that may hereafter be flowed by the Portsmouth Company's raising their dam five feet and two inches above the present flash board of five feet and ten inches as aforesaid, (which land for adjustment is now called ten acres, but is to be hereafter settled and measured according to the actual flowage, and damage occasioned by flowage, at one hundred and fifty dollars per acre.) If hereafter it be ascertained that more than ten acres be flowed or damaged, the same shall be sold and conveyed at the same rate per acre, and if less than ten acres be flowed or damaged, the land not damaged, to be reconveyed and taken back at the same rate per acre.

It is also agreed that the Salmon Falls Manufacturing Company sell and convey to the Portsmouth Company as much land as may be needed to change the location or raise the road by the premises flowed, at the same rate per acre, supposed at about one-half an acre.

It is also agreed that the Portsmouth Company relinquish to the Salmon Falls Manufacturing Company all claim to the privilege at Salmon Falls not connected with the flowage above purchased, that is to say, the one-twelfth part of the old saw mill privilege bought of the heirs of Richard Cutts, so far as respects the land, &c.

It is understood that payment shall be made for the foregoing purchase in five annual installments with interest, said interest payable annually.

Portsmouth, September 6, 1837.

JOHN HAVEN,
SAMUEL LORD.

Should the result of the flowage be any way detrimental to the Salmon Falls present wheel, a new modification shall be made to relieve the same.

This indenture, made and concluded on this thirtieth day of April, A. D. 1839, by and between the Salmon Falls Manufacturing Company of the one part, and the Portsmouth Company of the other part, witnesseth :

That the Portsmouth Company, for the consideration hereafter mentioned, doth hereby grant, bargain, sell and convey to the Salmon Falls Manufacturing Company and to its assigns forever all its right, title and interest in and to the lower falls at Salmon Falls, it being the one-twelfth part of the old saw mill privilege on the Berwick side, which the Portsmouth Company purchased of Charles N. Cogswell and which formerly belonged to Richard F. Cutts.

And the Salmon Falls Manufacturing Company for the consideration aforesaid and of the sum of five thousand three hundred and forty-eight dollars paid by said Portsmouth Company, the receipt whereof is hereby acknowledged, doth hereby give, grant, bargain, sell and convey unto the Portsmouth Company and its assigns forever, the right, license and permission to erect a dam at the Quamphegan Falls, between the town of South Berwick in the State of Maine, and the town of Somersworth in the State of New Hampshire, eleven feet higher than the old dam, which was erected at or near the place where the dam which contains the water, which propels the present wheels of the cotton factory of the Portsmouth Company is located, and the right and license to cause the water in the Salmon Falls river to flow back on the lower water falls at Salmon Falls between the towns aforesaid as high as the iron bolts of about one inch diameter, which have been driven into certain rocks, in the presence and by the direction of Joshua W. Peirce, Esq., the agent of the Salmon Falls Manufacturing Company, and Samuel G. Smith, Esq., the agent of the Portsmouth Company, and which will more fully and particularly appear by a certain writing, bearing date the eighth day of September, in the year of our Lord, 1837, and signed by the said Joshua W. Peirce, and the said Samuel G. Smith, a copy whereof is written on this sheet of paper and is to be deemed as part of this instrument, without the molestation or claim for damages for such flowage, occasioned as aforesaid, on the behalf of the Salmon Falls Manufacturing Company or its assigns forever.

In witness whereof the said Salmon Falls Manufacturing Company has caused its corporate seal to be affixed and the same to be subscribed by the major part of its directors, and the Portsmouth Company has caused its corporate seal to be affixed and the same to be subscribed by a major part of its directors, the day and year the first aforewritten.

Signed, sealed and delivered  
  in presence of us,  
SAMUEL LORD, Witness to the signature of Samuel Hale, William Stavers, Ich'd Rollins and Timothy Ferguson.  
J. F. SHORES, Witness to the same signatures.

SAMUEL LORD,  
J. F. SHORES.

SAMUEL HALE,  
WILLIAM STAVERS,  
ICHABOD ROLLINS,  
TIMO FERGUSON,

*L.S.  Directors of the Portsmouth Company.*

JOHN HAVEN,  
EDW. CUTTS,  
SAMUEL HALE,  
J. W. PEIRCE,

*L.S.  Directors of Salmon Falls Man. Co.*

STATE OF NEW HAMPSHIRE. ROCKINGHAM SS. May 6, 1839. Then the said Samuel Hale, William Stavers, Ichabod Rollins and Timothy Ferguson, directors of the Portsmouth Company acknowledged the aforewritten instrument to be the voluntary act and deed of said corporation ; and John Haven, Edward Cutts, Samuel Hale and Joshua W. Peirce, directors of the Salmon Falls Manufacturing Company acknowledged the aforewritten instrument to be the voluntary act and deed of said corporation. Before me,

J. F. SHORES, Notary Public.

The subscribers, J. W. Peirce, agent of the Salmon Falls Manufacturing Company, and Samuel G. Smith, agent of the Portsmouth Company, having been authorized for that purpose, have this day fixed permanent marks in the rocks on the Berwick side of the Salmon Falls river at the lower falls at Salmon Falls, lying between said Berwick in Maine, and Somersworth in New Hampshire, to denote the height at which said Portsmouth Company have a right to erect a dam at Quamphegan as conveyed to said Portsmouth Company by said Salmon Falls Manufacturing Company, by virtue of an agreement made between John Haven, Esq., on the part of said Salmon Falls Manufacturing Company, and Samuel Lord, Esq., on the part of the Portsmouth Company, on the fifth day of September, A. D. 1837. Said marks are iron bolts of about one inch in diameter driven into the ledge of rocks, one of which, the lowest down the stream, is directly under the termination of the fence at an oak tree on the bank of the river and which is the dividing line between the lands belonging to the said companies respectively ; and said marks are placed five feet and two inches above the top of the flash board now on the dam of said Portsmouth Company at Quamphegan, and eleven feet above the old dam which was at said Quamphegan prior to the year 1832 ; and said marks are below the top of the underpinning, at the beginning of the brick work at the southeast corner of the three following buildings respectively on the Somersworth side of said river, and belonging to the Salmon Falls Manufacturing Company, namely ; the machine shop four feet and eighty-three hundredths of a foot ; the factory eighteen feet and seventeen hundredths of a foot ; and the dye house seventeen feet and ninety-five hundredths of a foot ; and said heights were taken by George L. Whitehouse, Esq., this eighth day of September, 1837. In witness of the foregoing, we have hereto set our hands the day and year last mentioned.

Witness :

J. H. CUSHING,                              J. W. PEIRCE,

JAMES GOODWIN, JR.,                  SAMUEL G. SMITH.

Strafford County Records. Received May 10, 1839. Recorded Book 182, Page 110. Executed by

G. L. WHITEHOUSE, Recorder.

*Hatch*, and *Goodrich*, of Massachusetts, for plaintiffs.

*Christie*, for defendants.

BELLOWS, J.   This case comes before us upon bill, answers and proofs, and the points in controversy turn chiefly upon the construction to be given to the indenture entered into by the two corporations.

By that instrument the plaintiff corporation granted to the defendants the right to erect a dam at Quamphegan about one mile below the plaintiffs' works, and to raise the water of the river by means thereof, but to what height, is one of the principal points in dispute; the plaintiffs contending that the flowage is limited to the height of a certain iron bolt driven into a ledge by the river side, to mark the limit of such flowage; while the defendants contend that this iron bolt was placed to mark the height to which they might raise and maintain their dam, and that they are entitled to use it in the ordinary way, even if it raised the water above the bolt, as it must do whenever it run at any considerable depth over the dam at that height.

To determine this question, it becomes necessary to look carefully at the indentures, and also at the surrounding circumstances, in order to ascertain the intention of the parties.   By the indenture the plaintiffs grant to the defendant corporation, and its assigns forever, the right and license to erect a dam at these falls at a place described, eleven feet higher than the old dam at or near the same place, and the right and license to cause the water in the river to flow back on the lower water falls as high as the iron bolts driven into the rocks by the direction of Joshua W. Peirce and Samuel G. Smith, and which will more fully appear by a certain writing dated September 8, 1837, signed by said Peirce and Smith, a copy whereof is written on the same sheet of paper, and is part of the indenture.   This writing, so referred to and made part of the indenture, sets forth that said Peirce, as agent for plaintiffs, and Smith for defendants, had fixed permanent marks in the rocks by the side of the river by means of iron bolts, to denote the height at which the Portsmouth Company have a right to erect a dam at Quamphegan, as conveyed to said Portsmouth Company by the plaintiffs, by virtue of an agreement bearing date September 8, 1837, made between John Haven, Esq., on the part of the plaintiffs, and Samuel Lord, Esq., on the part of the defendants, and also sets forth that these marks are placed five feet and two inches above the top of the flash boards on defendants' dam, and eleven feet above the old dam at Quamphegan, which was there prior to the year 1832.

It will be perceived that this memorandum expressly states that these iron bolts were eleven feet above the old dam, and were placed to denote the height at which the defendants have a right to raise their dam, and this old dam is the same which is mentioned in the indenture.

But the plaintiffs offer evidence to prove that the bolts are more than eleven feet above the old dam, and were placed there, not to denote the height of the *dam*, but the height to which defendants might flow.

On this point the evidence is conflicting.   The log dam was irregular in its form, following the highest elevations of the ledge which extended across the river, was clearly not level on its top, and its general height was uncertain.   It was, therefore, prudent and even necessary in a matter of so much importance, that the height of the dam should

be fixed by some permanent monument, instead of leaving it to be settled by the conflicting memory of witnesses after the lapse of many years had removed all traces of the old dam.

Under these circumstances the positive statements in the memorandum made by Peirce and Smith, within about five years after the old dam had been superseded and while the Morton and Rogers dam was standing, and when there was a sufficient motive to investigate everything carefully, are entitled to great weight, and we think, give a decided preponderance to the defendants' testimony on this point.

Besides, as matter of law, we think it must be decisive, as the agreed height of the dam, as in the case of boundaries of land fixed by agreement. We are, therefore, of the opinion that the iron bolts were placed to denote the height of eleven feet above the old dam, and to which the defendants had a right to raise their dam.

The question, then, is, whether there is a limitation on the right to use a dam of that height, or whether the defendants acquired a right to use it in the ordinary way.

The grant is of a right to erect a dam of the sufficient height, which, as we have seen, is to the level of the iron bolts; and the right and license to cause the water to flow back as high as the said bolts.

These terms it will be seen are apparently inconsistent with each other. The grant of a right to erect a dam upon a river necessarily implies a right to maintain it, and use it in the ordinary way, and to cause the water to flow over it, unless there be some restriction.

If it be held that the right to flow is limited to the iron bolt which is the mark for the height of the dam, then it is clear that it must operate practically to take from that height so much at least as the depth of the water on the dam at its highest stages, which is shown by the evidence to be on one occasion forty-one and a half inches, about three and a half feet, and so giving the right to raise the dam seven and a half feet above the old dam, instead of the eleven feet specified in the previous part of the instrument.

Such a construction would also limit the flow to the precise height of the dam, without allowing the water to rise so high as to flow over it. This is apparent from the fact that with the dam sixteen inches below the bolt, the water at the bolt, when the dam is just full, will stand about two inches higher than at the dam.

In addition to this, we have the opinions of experts that there is no way by which a dam of this height can be so managed as to regulate the height of the flow at the iron bolt, so as to keep it below it, and we think there is nothing in the papers to show that anything of that sort was contemplated by the parties.

Therefore, giving these two clauses their ordinary signification, they must be regarded as ambiguous or inconsistent with each other, and it becomes necessary to examine all the provisions of the indenture and the papers referred to therein, with the view to gather from them the intention of the parties, and to construe the language used in the sense in which it appears they understood it.

The mutual intention of the parties is the great object of inquiry;

and to carry that intention into effect, the law will sometimes control the terms of the contract when they clearly contravene its purpose and object.   2 Kent's Com. 758, *554.

The proper interpretation of a contract is that which will make it speak the intention of the parties at the time it was made, and to accomplish that, too much stress is not to be laid upon the precise meaning of words when the intention is manifest.   Chitty on Contracts, *73; 2 Smith's Lead. Ca. *244.

So, in construing a contract where the terms are ambiguous, the court will examine all its provisions, its subject matter, the situation of the parties at the time, and the object intended to be effected, with a view to discover the sense in which those terms are used.   Chitty on Con. *74.

In *Warren* v. *Mansfield*, 8 Met. 96, Shaw, C. J., says one good rule is this : "To read the whole instrument through, and, applying it to the subject matter, to ascertain the leading scope and purpose of the parties in making the contract; and where there is a difficulty in carrying out the details, as contemplated by particular clauses, to construe all such particular clauses so as best to promote and accomplish the primary and leading purpose of the contract."

The substance of the contract in that case, was to sell and deliver to the defendant at specified times, all the timber on a certain lot of land of the plaintiff, for which plaintiff was to receive in part payment a certain tract of land, and the balance in money; but the defendant expressly agreed to give his note for all the timber delivered on or before one of the days specified, that is, July 1, and his note for the half of balance on October 1.   It turned out that all the timber delivered did not equal the value of the land.   In a suit for not giving the note for amount delivered by July 1, it was held that defendant was bound to give a note only for the balance after applying the land.

Similar doctrines are recognized in *Sawyer* v. *Hammatt*, 15 Maine Rep. 40, *White* v. *Gay*, 9 N. H. 126, *Clough* v. *Bowman*, 10 N. H. 513, *Bell* v. *Sawyer*, 32 N. H. 72, *Hibbard* v. *Hurlburt*, 10 Vermont 178.

Applying these rules of construction to the instrument before us, the question is, what was the intention of the parties to this indenture?

Upon a careful examination of the whole instrument, we think the leading purpose and object of the parties was to convey to the defendants the right to maintain a dam as high as the level of the iron bolts, and to use it in the ordinary way, including the right to raise the water as high on the dam as the highest freshets would carry it.

This right to use the dam, would, in all cases, be implied from a grant of the right to erect it, unless some limitation was expressed; and especially would it be so, where, as in this case, the plaintiffs had no title to the land whereon the dam was to be placed, because, unless the right thus to use the dam was given, the words of this grant would be wholly inoperative.

The indenture under consideration was made to carry into execution with some slight modifications, the preliminary agreement between the

parties, and it incorporates and makes part of the instrument the mem-. orandum of Peirce and Smith; and this memorandum states that the iron bolts were placed to denote the height to which the defendants have the right to erect a dam by virtue of this preliminary agreement, thus referring to that agreement as the foundation of the defendants' right.

Under these circumstances, it is proper to read all these instruments with the view to collect the intention of the parties, not that the preliminary agreement can control the express and unambiguous terms of the indenture, but it may be looked into with the other papers in order to collect the intention of the parties, and determine the sense in which ambiguous or inconsistent terms were used.

Accordingly, where an instrument has been altered previous to its execution, the court will look at it as it originally stood, and at the alterations, in order to discover the intentions of the parties. Chitty on Con. *89, 93, and cases cited; *Warren* v. *Merrifield*, 8 Met. 93. So it is laid down in 2 Parsons on Contracts, that letters containing the negotiations may be read to explain the terms of a contract afterwards reduced to writing, though not to vary the force and effect of the instrument. It is said also that equity will look even at a second instrument, in construing the effect of a former. Ch. on Con. *89, 93.

So, in reforming contracts, there is less difficulty where the mistake is mainly or wholly made out by a preliminary written memorandum of the agreement. 1 Story's Equity Jur. sec. 160; and it would necessarily be inferred that in arriving at the intention of the parties when that was material in construing the final written instrument, the preliminary agreement may be read.

In *Sawyer & al.* v. *Hammatt*, 15 Maine Rep. 40, it was held that in construing a written contract, an agreement between other persons referred to in the contract in question, might be read in explanation of it. The former agreement was in fact admitted to control the latter, so far as to change an express stipulation as to the time of getting off certain timber from a limited to a reasonable time.

Upon these principles we have no hesitation in looking at all these papers with a view to discover the intentions and purposes of the parties in making this contract, and we think that the leading objects were the purchase and sale of a right to flow back on the lower Salmon Falls so high as a dam at Quamphegan Falls, raised to the level of the iron bolts, would naturally, and with a proper construction of such clause, carry it, at any stage of the water, with the provision, however, that the flowage should not be injurious to the water wheel of the plaintiffs, as existing September 6, 1837, and we do not discover any intention to limit the flow upon those falls in any other way.

The preliminary agreement provides for the sale of eleven feet of the lower Salmon Falls, according to the perpendicular scale on Mr. Peirce's profile plan, or five feet and two inches above the water on the present flash boards at Quamphegan, for the sum of $5348.00, with a memorandum at the end of the agreement that if the result of the flowage be in any way detrimental to the Salmon Falls present wheel, a new modification should be made to relieve the same.

The intention here to grant an unlimited right to flow as far as a dam of that height would raise the water, so that it did no injury to the then present wheel of the plaintiffs, is perfectly manifest; and in the same direction is the stipulation by the plaintiffs to sell and convey to the defendants so much land belonging to them as might thereafter be flowed or damaged by a dam of that height, at $150.00 per acre.

In the memorandum of Peirce and Smith of September eighth, and which is expressly made a part of the indenture, this preliminary agreement is referred to as giving to the defendants the right to erect such a dam.

In the indenture, instead of conveying in terms so many feet of the lower Salmon Falls, as in the preliminary agreement, the plaintiffs convey the right to erect a dam at Quamphegan; but it is apparent that the effect is substantially the same, and to be accomplished by a dam of the same altitude as that contemplated in the preliminary agreement, and the price paid for the right is also the same.

Under such circumstances a construction of the indenture that would limit the flow to the height of the iron bolts, and thus practically limit the height of the *dam* to a point as much below the eleven feet designed to be granted, as the depth of the water on the dam at its highest stages, could not, we think, have been contemplated by the parties.

Such a construction would reduce the dam, according to the proofs before us of the depth to which the water sometimes flows over defendants' dam, to about seven and a half feet above the old log dam, which would be but one foot and eight inches higher than the Morton and Rogers dam with its flash boards as it was in 1837.

If such a limitation was necessary to protect from injury the plaintiffs' wheel as it existed at the time of the preliminary agreement, the evidence of intention would stand very differently; but we are satisfied that it was not, and there is nothing in the case apart from the clause in question, that indicates any intention to limit the flow on their lower falls by a dam of the prescribed height, unless it should interfere with the wheel as then existing. It appears that this wheel was in September, 1837, five and a half feet above the iron bolts, and there is no evidence before us that the water has ever been raised so high by several inches.

In 1861, the defendants built a new dam within sixteen inches of the level of the bolts, and observations made since then, show that the water has occasionally risen upon the plaintiffs' wheels, which are now two and a half feet lower than in 1837. On one occasion, April 19, 1864, during a heavy freshet, it rose on those wheels to the depth of twenty-five and a half inches, but this, it will be perceived, would not have reached the wheel of 1837 by several inches.

Besides, in the opinion of competent engineers, Messrs. Whitehouse, Straw and Wiggin, the water at the wheels in high stages could not be affected by the defendants' dam, but that such is the character of the stream and the fall below plaintiffs' mills, that their wheels in high stages would be affected in the same manner, substantially, if defendants' dam were removed, and this opinion seems to be sustained by ob-

servations where a considerable space of the planking of that dam had been taken up, and the waste gates were open so that the water was not deep on the dam.    Nor is this opinion controverted by engineers on the part of the plaintiffs.

We are, therefore, of the opinion that the dam of defendants could not be detrimental to the plaintiffs' wheel as it was in 1837, even if raised to the level of the bolts, and the weight of the evidence is also that it could not affect even the present wheels.    Nor does the bill state such a case, but only that defendants' dam raises the water on the lower falls thirty inches above these bolts, which would be still below plaintiffs' wheels.

Under these circumstances it is difficult to conceive that the parties designed to limit the flow of water to the level of the iron bolt, which we have found to be the height to which defendants were allowed to raise their dam.

On the contrary, we think that looking at every part of the contract the intention was to grant a right to raise the water as high as a dam brought to the level of the iron bolt would raise it, unless it interfered with the plaintiffs' wheel as it stood in 1837, and that it could not do so, we think has been made manifest.

We are, therefore, brought to the conclusion that the terms in the indenture looking to a limitation of the right of flowage, to a level of the dam itself, could not have been used by the parties in that sense, and that they must be controlled by the manifest intention of the parties as gathered from the whole instrument with the papers referred to; and accordingly we are of the opinion that the indenture must be construed to grant a right to raise a dam at Quamphegan, eleven feet higher than the old log dam, which point is by the agreement conclusively fixed by the iron bolts, and to raise the water by means of a dam of that height constructed in a proper manner, as high as it will naturally be raised in the highest freshets.

It is true that the license to raise the water as high as the iron bolts would ordinarily be interpreted as restrictive, and to limit the flow to that point; but it *might* be understood by the parties to give a right to flow to that point ordinarily when the dam was filled, but to exceed that height, as it must necessarily do in freshets and at other times, not of long duration, when the water was at any considerable depth on the dam. Had the grant been, in terms, of a right to raise the dam to the height of the iron bolts, and to flow to the same extent by means of it, it would be difficult to conceive that the right to exceed that height in freshets would not be understood and implied as resulting from a right to use such a dam at all, and such is, in substance, as we construe it, the character of this grant.

Our opinion, therefore, is, that the plaintiffs have failed to prove that the defendants have raised their dam, or the water, by the means of it, higher than they acquired the right to do, by this grant of the plaintiffs, and that upon this point plaintiffs are not entitled to the relief they seek.

But the plaintiffs ask also that defendants be decreed to take of the plaintiffs a conveyance of the land of the plaintiffs flowed or damaged by the dam of the Portsmouth Company, and pay for the same at the rate of one hundred and fifty dollars per acre, according to the provisions of the preliminary agreement between the corporations.

'In answer to this, the defendants contend that the indenture contains all the stipulations between the parties on this subject, and that in that instrument were finally absorbed and merged all the stipulations contained in the preliminary agreement; and the defendants also argue that this preliminary agreement was made without authority, and has never been ratified by the Portsmouth Company.

On referring to the answer of the defendants, however, it appears that they have distinctly set out this agreement as the agreement of the two corporations, and that must be regarded as conclusive on the latter point.

In regard to the other, namely, whether all stipulations of the preliminary agreement are absorbed or merged in the indenture, it will be observed that in the former instrument it was agreed that the plaintiffs should sell and convey to the Portsmouth Company so much of their land as should be flowed or damaged by a dam raised to the height specified, at one hundred and fifty dollars the acre, to be called ten acres for present adjustment, but to be afterwards settled and measured according to the actual flowage, and damage by flowage.

The date of this agreement was September 6, 1837, and the indenture was made April 30, 1839; and in that instrument there was no conveyance of any land whatever; but the right to flow was conveyed, and, for aught we can see, to the extent of all the lands of the plaintiffs, that would be flowed by a dam of the prescribed height.

This right to flow, however, confers no title to the land, and although the defendants might not desire any, the agreement was to take and pay for whatever was flowed or damaged, the amount to be ascertained ultimately by the actual flowage and damage caused by flowage.

The question, then, is, whether this grant of a license to flow the plaintiffs' land was intended as a substitute for the agreement to take and pay for the land itself, or whether the obligation to take and pay for the land still remained to be carried into effect when the quantity of land should be determined by the actual flowage.

Upon a careful examination of the terms of the instruments, our opinion is, that the agreement to take and pay for the land so flowed and damaged, still remains, and was not superseded by the indenture.

The right to flow it was necessarily given that the parties might be in a situation to determine what land was to be conveyed, and although it might be useful to the defendants chiefly for flowage, yet the court cannot say that it is not wanted for other purposes. At all events, the plaintiffs might have an interest in perfecting the conveyance, and the agreement gives them the right to require it, unless it is merged in the indenture.

By the original agreement plaintiffs were to sell eleven feet of the lower falls, or five feet two inches above the water on the flash boards

of the dam then existing, for $5348.00, and also to convey to the Portsmouth Company so much of their land at $150.00 per acre, as should be flowed or damaged by a dam of the height prescribed, estimated at ten acres. By Mr. Sawyer's survey he makes the land actually flowed, with the dam at the present height, at fifteen and a half acres, making the amount at $150.00 per acre, $2325.00.

On the other hand, the Portsmouth Company agreed to relinquish to plaintiffs their interest in the Salmon Falls privilege, but without stating in this agreement expressly the consideration for it, leaving it to be inferred that it made part of the consideration for the plaintiffs' stipulations.

Now, we understand that, by the indenture, the plaintiffs conveyed to the Portsmouth Company, in substance, although not in the same terms, all the water power that they stipulated to convey in the preliminary agreement, for which the Portsmouth Company paid the price that was fixed by that agreement, and nothing whatever was paid for the flowage.

It is urged, indeed, by defendants, that all that was stipulated to be conveyed by the preliminary agreement was not actually conveyed; that by the agreement eleven feet of the lower Salmon Falls was to be conveyed, whereas by the indenture no part of the falls was conveyed, but only the right to flow back on those falls by a dam raised five feet and two inches above the flash boards of the dam then existing.

It is clear, however, that this is the height contemplated in the original agreement, and it may well be contended that this right to flow was what, by a fair construction was intended by that agreement. At all events, it would seem that this was the construction put upon it in making the indenture.

This being the case, there would seem to have been nothing paid for the flowage whatever; and this may be urged with some force against the position that the stipulations in the preliminary agreement were all merged in the indenture. There is, also, force in the fact that the preliminary agreement was never cancelled.

On the other hand it is urged that the land to be flowed by such a dam as was contemplated, was estimated for present adjustment at ten acres; and that so much, at least, would naturally have been conveyed by the indenture had it not been superseded by another arrangement.

But to this it may be answered that until the dam had been raised, and the water actually thrown on to the land, it would be difficult to fix the boundaries of the ten acres, and therefore the expediency of waiting until the dam was so raised would naturally be suggested. This was not done until the autumn of 1861, and therefore we think there was no unreasonable delay in seeking for the performance of this agreement.

We are, therefore, of the opinion that the plaintiffs are entitled to a decree that the Portsmouth Company shall take and pay for the land so flowed or damaged, at the price of $150.00 per acre, and that a master be appointed to report to this court the amount of land so flowed or damaged, together with the boundaries of the same, so that a conveyance thereof may be made; and as to the instructions to the master

the court will consider any suggestions the parties may be disposed to make.

In respect to the other defendant, Samuel Hale, our decree is that the bill be dismissed.