Chemical v. Textiles                    CV-91-073-M    03/29/96

UNITED STATES DISTRICT COURT FOR THE
                       DISTRICT OF NEW HAMPSHIRE


Chemical Fabrics Corporation,
      Plaintiff,

      v.

Textiles Coated, Inc.; Robert C.
Ribbans, III; and Stephen W. Tippett,
      Defendants.
                                                Civil No. 91-73-M
Textiles Coated, Inc.; Robert C.
Ribbans, III; and Stephen W. Tippett,
      Counterclaim Plaintiffs,

      v.

Chemical Fabrics Corporation,
      Counterclaim Defendant.


                          DECISION AND ORDER


        Plaintiff, Chemical Fabrics Corporation ("CFC"), sues

defendant, Textiles Coated, Inc. ("TCI"), for breach of a mutual

release and settlement agreement ("Agreement") that resolved a

prior lawsuit, and for unfair competition.  TCI counterclaims for

attorneys' fees in connection with CFC's now abandoned patent

infringement claim.  This court (Devine, J.) previously granted

CFC's motion for summary judgment, finding that under the

unambiguous terms of the Agreement TCI was in breach.  On appeal

the Federal Circuit reversed, holding the Agreement's terms to be

ambiguous as a matter of law, and remanded for a trial on the merits.  The case was tried to the court.

FINDINGS OF FACT AND RULINGS OF LAW

## I.    FACTUAL BACKGROUND

CFC and TCI are competitors in the manufacture and sale of corrosive-resistant materials used mainly in the fabric expansion joint market.  On May 7, 1985, CFC filed suit against TCI and its officers in New Hampshire Superior Court alleging, _inter alia_, interference with employment agreements and theft of trade secrets.  In November of 1987, that action was settled when the parties executed the referenced Agreement.

The Agreement provides in relevant part that TCI:

> shall not engage in the manufacture or sale of coated or laminated products based on alloying or multilayering of fluoroplastic and/or fluorelastomeric materials. (_Excepted from the immediately preceding sentence is the lamination of fluoroplastics where the bonding agent or material is not integral to either of the materials being laminated_).

Agreement ¶ 2(C) (emphasis added).  CFC now alleges that TCI's manufacture and sale of its TEXLAM and TEXFILM products violates the cited provision of the Agreement.

2

## A.    The Parties' Products and Processes

Both parties make products that are composed, in part, of multiple layers of fluoroplastic materials. Polytetrofluoroethylene ("PTFE") is a major component in both parties' products.  PTFE is a capable high temperature fluoroplastic, but the molecular weight and viscosity of PTFE are such that it requires high temperature and pressure to create a face-to-face bond with another PTFE surface.

FEP and PFA are fluoroplastics that were developed to facilitate the bonding of PTFE materials to one another through a lamination process.  (Tippett, 12/8 am, p.12; Effenberger, 12/6 am, p.41.)  The lamination of fluoroplastics such as PTFE, FEP, and PFA is generally accomplished by placing discrete layers of fluoroplastic materials on top of one another and applying heat and pressure, causing the various materials to melt together. (Effenberger, 12/6 am, p.64, 67, 96; Ribbans, 12/6 pm, p.44; Tippett, 12/8 am, p.15.)  Sandwiching a layer of FEP or PFA between PTFE materials facilitates the bonding of the PTFE materials to one another because FEP and PFA effect a firmer bond with PTFE in a shorter time and with less pressure than would be required to bond one PTFE surface directly to another.  (Tippett, 12/8 am, p.15-17.)

3

TCI manufactures three products relevant to this litigation. First, before the Agreement, TCI manufactured and sold TEXCOAT, which consisted of a woven fiberglass substrate coated on both sides with a single layer of PTFE. (D.Ex. 207; Tippett, 12/7 pm, p.98-99.) CFC does not contend that TCI's manufacture or sale of TEXCOAT constitutes a breach of the Agreement.

In the spring of 1988, TCI began manufacturing and selling a different product, TEXLAM. TEXLAM consists of a single layer of PFA film sandwiched between two layers of TEXCOAT. (D.Ex. 209.) The PFA film interlayer acts as a bonding agent, facilitating joinder of the two layers of TEXCOAT to one another by means of the lamination process. Prior to lamination, each of the three distinct component parts of TEXLAM is separate from and not integral to the other two. (Effenberger, 12/6 am, p.88, 92-93.) Only after lamination do the two layers of TEXCOAT and the single layer of PFA film bond, forming a single layer of TEXLAM. (Niles, 12/5, p.49.)

Finally, in the spring of 1991, TCI began manufacturing and selling yet another product, TEXFILM. TEXFILM consists of a single layer of PTFE film laminated directly onto a single layer of TEXCOAT. (D.Ex. 210.) No FEP, PFA, or other fluoroplastic substance is incorporated into TEXFILM, either as a separate

4

bonding agent or as a coating on either the PTFE film or the TEXCOAT substrate. (Id.; Ribbans, 12/6 pm, p.78.)

In manufacturing its own competing products, CFC employs a proprietary bonding process relevant to its suit against TCI. Instead of laminating three layers of fluoroplastics together in a single high-pressure and time-consuming step, CFC uses a lower cost and lower pressure method to produce "multilayer cast films." (D.Ex. 65, 206.) Essentially, before laminating a layer of PTFE to another substrate, CFC "casts" a thin layer of FEP on the layer of PTFE. According to CFC's product information, as a result of the casting process the thin layer of FEP becomes an integral part of the base PTFE. (D.Ex. 67.) The resulting multilayer cast film, consisting of a layer of FEP cast to a layer of PTFE, can then be easily laminated to another substrate without the use of a separate FEP or PFA film. By utilizing its multilayer cast film technology, CFC was able to develop very flexible laminated composites not easily produced through the normal laminating method. (Tippett, 12/8 am, p.12-29.)

## II. DISCUSSION

### A. Interpreting the Contract

5

Stripped of technological complexities, the parties' legal dispute is rather straightforward:  Does the Agreement bar TCI from manufacturing and selling TEXLAM or TEXFILM?  CFC argues that TCI breached the terms of the Agreement when it manufactured TEXLAM and TEXFILM because both products are multilayered fluoroplastic materials that do not fall within the parenthetical exception of Paragraph 2(C) of the Agreement (which allows TCI to produce laminated fluoroplastics only "where the bonding agent or material is not integral to either of the materials being laminated").  Agreement ¶ 2(C).  TCI, on the other hand, argues that both TEXLAM and TEXFILM fall squarely within the exception and, as a result, TCI is not in breach of the Agreement.  Thus, this case presents a basic question of contract interpretation.

It has long been the rule in New Hampshire that "the proper interpretation of a contract is that which will make it speak to the intention of the parties at the time it was made." Griswold v. Heat, Inc., 108 N.H. 119, 123, 229 A.2d 183, 186 (1967) (quoting Salmon Falls Mfg. Co. v. Portsmouth Co., 46 N.H. 249, 255 (1865).  If the contract is ambiguous, as the Court of Appeals for the Federal Circuit has held the Agreement here to be, "the court must examine the contract as a whole, the circumstances surrounding the execution, and the object intended

6

by the agreement."  Woodstock Soapstone Co. v. Carleton, 133 N.H.
809, 815, 585 A.2d 312, 315 (1991); MacLeod v. Chalet Susse
Int'l, 119 N.H. 238, 243, 401 A.2d 205, 208 (1979) ("Intent . . .
should be determined not only in light of the instrument itself,
but also in view of all the surrounding circumstances.")  "The
course of conduct of the parties . . . following their agreement
is further evidence of their common understanding of the meaning
of their contract and the result they expected to accomplish
thereby."  Griswold, 108 N.H. at 123.

In determining whether TCI is in breach of the Agreement,
the court will first construe the Agreement, particularly the
exception described in Paragraph 2(C), in light of the evidence
of the parties' intent.  The court will then proceed to determine
whether TCI's manufacture and sale of TEXLAM or TEXFILM breached
the Agreement as construed.

### 1.   CFC's Interpretation of the Contract

CFC asserts that the Agreement was intended to bar TCI from
manufacturing any laminated fluoroplastic products using either
FEP, PFA, or PTFE film as a bonding agent.  The parenthetical
exception included in Paragraph 2(C) of the Agreement, CFC
argues, was intended to permit TCI to manufacture fluoroplastic

7

laminates using only more conventional non-fluoroplastic bonding agents.

Attempting to justify its narrow interpretation, CFC points out that the Agreement prohibits TCI from manufacturing any product in which, after lamination, the bonding material becomes integral to the other materials being laminated. This argument proves too greedy. The very object of lamination is the creation of a single, integrated material out of several distinct components through the application of heat and pressure. Therefore, after lamination, a bonding agent, whether a fluoroplastic or not, necessarily becomes "integral" in some sense to the other layers that were laminated together. Under CFC's proposed reading of the exception, TCI literally would be prohibited from laminating any fluoroplastics, and the "exception" would be meaningless.

CFC's proposed construction is also potentially at odds with the language of the Agreement, which bars TCI from using bonding agents "integral to either of the materials being laminated." Use of the present tense "being laminated" suggests, without being dispositive of the issue, that the bonding agent must be integral to one or both of the materials prior to the lamination process and not, as CFC suggests, after lamination.

8

In a second attempt to justify its interpretation, CFC draws a distinction between "bonding agents" and "bonding materials." CFC asserts that each bonding material, such as an FEP or PFA film, has a bonding agent integral to it. Because the Agreement bars TCI from laminating fluoroplastics "where the bonding agent or material is . . . integral to either of the materials being laminated," the argument continues, TCI cannot utilize FEP or PFA film in its laminating processes.

However, the distinction CFC tries to draw finds no support either in the language of the Agreement or the evidence before the court. Indeed, CFC can only point to a general dictionary definition of "integral," unrelated to the Agreement's context, to buttress its otherwise groundless interpretation. (CFC Mem. at 27.)

Finally, both of CFC's theories of construction are belied by the testimony of its own Dr. John Effenberger, who stated that under the Agreement CFC intended to permit TCI to use a layer of PFA or FEP film to join together two pieces of TEXCOAT. (Effenberger, 12/6 am, p.102.) Under the interpretations CFC now offers, TCI would be banned from even that process. In light of evidence both intrinsic and extrinsic to the document, the Agreement cannot reasonably be read to prohibit TCI from using

9

<u>all</u> fluoroplastic bonding films in its laminates.  Another interpretation is more accurate, more reasonable, and more consistent with the parties' intent.

### 2.    TCI's Interpretation of the Contract

TCI offers a broader and more realistic interpretation of the exception language.  TCI says that under the terms of the Agreement, properly read, it is precluded from using CFC's proprietary casting process and from using multilayered cast films in the manufacture of its laminates, particularly where a PFA or FEP is integral to the film and acts as a bonding agent in a lamination process involving the cast film.  The evidence presented at trial supports TCI's interpretation of the Agreement.

PFA and FEP are conventionally-used, melt-bondable fluoroplastics.  Their use for that purpose has been well known in the industry for decades.  (Effenberger, 12/6 am, p.41, 94; Ribbans, 12/6 pm, p.70.)  In a conventional laminating process involving fluoroplastics, PFA and FEP films are, prior to lamination, components separate and distinct from the fluoroplastic materials being bonded together. (D.Ex. 209.)  In contrast, in CFC's proprietary casting process, FEP film is,

10

prior to lamination, already integral to one of the fluoroplastic materials to be bonded, usually a multilayered cast film. (D.Ex. 67, 206.) CFC's cast film process produces, therefore, a fluoroplastic material with a bonding agent integral to that material. When that cast film fluoroplastic material is laminated with another fluoroplastic material, the integral bonding agent facilitates low pressure, low heat and low time lamination — precisely the type of bonding of fluoroplastic materials the Agreement prohibits TCI from engaging in.

TCI's interpretation is also entirely consistent with the parties' competitive positions at the time the Agreement was struck. Through its casting process, CFC was able to manufacture laminates which were more flexible than those that could be made using the higher pressure, and more expensive, conventional laminating process. It's technical innovation gave it a competitive edge in the marketplace. It is apparent, therefore, that by prohibiting TCI from utilizing "bonding agent[s] . . . integral to either of the materials being laminated," CFC intended to prevent TCI from using its less expensive, more effective, and more efficient proprietary casting process when laminating fluoroplastic materials.

11

This construction of the Agreement is further borne out by the negotiations leading up to the Agreement. The first proposed settlement agreement drafted by CFC prohibited TCI from engaging in "the manufacture or sale of coated or laminated products based on alloying or multi-layering of fluoroplastic . . . materials." (D.Ex. 63, 73; P.Ex. 175.) TCI rejected that proposal because TCI would be precluded from laminating any fluoroplastic materials at all and felt it had to retain some laminating capabilities. (Tilgner, 12/6 am, p.8-10.) In response to TCI's request, CFC drafted a second iteration of the settlement agreement which allowed TCI to laminate two layers of PTFE coated glass (TEXCOAT) using a single layer of PFA or FEP film as a bonding agent. (D.Ex. 74.) This agreement, too, was rejected by TCI as being too restrictive. After several more iterations, the parties settled on the exception language contained in the current Agreement. Duane Montopoli, the chief negotiator for and president of CFC, described the final Agreement as follows:

> [W]e were in the final analysis willing to allow TCI to make fluoroplastic laminates, but not through any means whereby the fluoroplastic <u>on the surface of the materials being laminated</u> was used as a bonding agent. And this exception does allow TCI to make fluoroplastic laminates, but not in that manner.

12

(Montopoli, 12/5, p.103-104.)  (emphasis added)  Evidence of the negotiations fully supports TCI's claim that it demanded, and eventually obtained, recognition of its right to make fluoroplastic laminates so long as it did not utilize the proprietary casting process that gave CFC a competitive edge in the marketplace.

In light of the evidence bearing on the parties' intent, the court finds that the parenthetical exception found in Paragraph 2(C) of the Agreement was intended to allow TCI to use discrete fluoroplastic films to bond together other fluoroplastic materials in a conventional laminating process, but preclude TCI's use of fluoroplastic films that, prior to lamination, have been made integral to one or both of the fluoroplastic materials being laminated.

### B.    Determining Breach

The meaning of the Agreement having been established, the court now turns to the question of whether TCI's manufacture and sale of TEXLAM or TEXFILM constituted breach of the Agreement. If either product is made by employing a fluoroplastic bonding film that, prior to lamination, is integral to a fluoroplastic material being laminated, then its manufacture violates the

13

Agreement.  If, on the other hand, either product uses a fluoroplastic bonding film that, prior to lamination, has not been integrated into another fluoroplastic material being laminated, its manufacture does not constitute breach of the Agreement.

### 1.    TEXLAM

TEXLAM is made of three components — two layers of TEXCOAT and a single layer of PFA film, none of which is integral to the others prior to lamination.  Even Dr. Effenberger readily agreed that the "process of using PFA or FEP film to join together two pieces of TEXCOAT was . . . okay" with CFC.  (Effenberger, 12/6 am, p.102.)  TCI did not, therefore, breach the settlement agreement when it manufactured and sold TEXLAM, and the court so finds.

### 2.    TEXFILM

TEXFILM is made of two component parts, a layer of TEXCOAT and a single layer of PTFE film.  The PTFE film is not coated or cast with another fluoroplastic.  Nor is any other fluoroplastic film used to bond the two component parts together.  Rather, the

14

PTFE film bonds directly to the TEXCOAT, forming a thin protective covering.

CFC contends that because TEXFILM requires no PTA or FEP bonding film, the PTFE film in the product acts as both a bonding agent and a fluoroplastic material being bonded. Thus, the argument goes, TEXFILM utilizes a "bonding agent that is integral to the fluoroplastic material being bonded" (i.e. because the fluoroplastic material (PTFE) being laminated acts as its own bonding agent — its bonding characteristics are "integral" to itself as a laminate). So, CFC argues that TCI's manufacture of TEXFILM constitutes a breach of the Agreement.

CFC's characterization of the PTFE film in TEXFILM is, however, contradicted by expert testimony given at trial. Dr. Edwin Thomas credibly testified that because PTFE film and TEXCOAT bond directly to one another, TEXFILM contains no bonding agent per se. (Thomas, 12/8 pm, p.15.) In addition, when asked whether the adhesive property of a film can "properly be said to be integral to its property as a protective coating," Dr. Thomas replied, "I would not refer to [the dual properties of the film] as being integral to that substance." (Thomas, 12/8 pm, p.51-52.) The court credits Dr. Thomas's testimony and concludes that the parties did not intend to preclude TCI from laminating PTFE

15

or other fluoroplastics together where no separate identifiable bonding agent (other than the fluoroplastics own bonding characteristics) has previously been made integral to the fluoroplastics being laminated.

Finally, the single layer of PTFE film used in TEXFILM does not at all resemble the multilayer cast films with integral bonding agents that were the focus of protection under the Agreement. As a practical matter, PTFE film bonds with TEXCOAT (the outer layer of which is PTFE) only at a <u>higher</u> pressure and after a <u>longer</u> period of time than would be the case if FEP or PFA film was used as an integral bonding agent, so use of that process does not intrude on the interests CFC sought to protect under the Agreement. (Tippett, 12/8 am, p.15.) The court therefore accepts Dr. Thomas's testimony and finds that TCI did not breach the Agreement when it manufactured and sold TEXFILM, since the Agreement was not meant to prohibit TCI from laminating one PTFE substrate directly to another PTFE substrate, particularly when no separate bonding agent made integral to one of the PTFE substrates prior to lamination has been employed.

**C. CFC's Claims of Unfair Competition**

16

CFC also sues TCI for unfair competition in violation of section 43A of the Lanham Act, 15 U.S.C. § 1125, and the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2. Both claims arise from a single advertisement distributed by TCI that described tests performed on TEXLAM by E.I. DuPont de Nemours & Company ("DuPont"). While CFC has asserted these claims, it has understandably pursued and briefed them with little vigor. Because CFC's unfair competition claims are without merit, the court will address them in the same summary fashion.

The Lanham Act requires the plaintiff to prove that the defendant made a "false or misleading representation of fact, which is likely to cause confusion . . . as to the . . . origin, sponsorship, or approval of his or her goods . . . ." 15 U.S.C. § 1125(a)(1) (emphasis added). Similarly, N.H. Rev. Stat. Ann. § 358-A:2(V) proscribes "[r]epresenting that goods . . . have sponsorship [or] approval . . . that they do not have . . . ." Id.

CFC has failed to meet its burden of proof under either of these statues. It has offered no evidence that any statements in TCI's advertisement are actually false. Instead, CFC claims that TCI's statement that the "TEXLAM product was selected [by DuPont]

17

as a candidate [for testing] due to its chemical resistance traits, its high tensile strength, and its flexibility" created the false impression that DuPont had endorsed TEXLAM, when it had merely tested it.

TCI's advertisement could be read, and apparently was read by CFC, to imply sponsorship of TEXLAM by DuPont. However, such a reading is a strained one. The advertisement certainly does not represent that TEXLAM is sponsored, approved, endorsed, or recommended by DuPont. Nor is the advertisement likely to have caused confusion as to the sponsorship of TEXLAM. It simply states that DuPont selected TEXLAM for testing because of its useful attributes, a factually correct, though implicitly puffed, statement. TCI's advertisement did not, therefore, violate either the Lanham Act or the New Hampshire Consumer Protection Act.

## D.   TCI's Counterclaim for Attorneys' Fees

Pursuant to 35 U.S.C. § 285, TCI seeks attorneys' fees and costs for defending against plaintiff's claim for patent infringement, a claim plaintiff dropped prior to trial. 35 U.S.C. § 285 provides, "The court in exceptional cases may award reasonable attorney fees to the prevailing party." Id. (emphasis

added).  In order to demonstrate that this was an "exceptional case,"  TCI must prove by clear and convincing evidence that CFC pursued its patent infringement claim without a reasonable belief in its merits.  Carrol Touch, Inc. v. Electro Mech. Sys., Inc., 15 F.3d 1573, 1584 (Fed. Cir. 1993).

TCI has not met this high burden.  In fact, some evidence elicited at trial relative to the flexibility and thickness of TCI products and their component parts would have been supportive of CFC's abandoned infringement claim.  While, standing alone, that evidence would not have been sufficient to prove an infringement claim, it does demonstrate that CFC could have had a good faith basis for bringing and pursuing that claim.  Therefore, TCI's motion for attorneys' fees and costs is denied.


## III. CONCLUSION

For the foregoing reasons, the court holds that TCI did not breach the terms of the Agreement, nor did TCI violate the Lanham Act or the New Hampshire Consumer Protection Act.  TCI is not, however, entitled to attorneys' fees on CFC's abandoned patent infringement claim.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of

19

Civil Procedure.  Any requests for findings or rulings which are not expressly or implicitly granted in the body of this opinion are hereby denied.  See Applewood Landscape & Nursery Co. v. Hollingsworth, 884 F.2d 1502, 1503 (1st Cir. 1989).

Judgment shall be entered in favor of TCI on CFC's claim of breach of the settlement agreement and on CFC's claims under the Lanham Act, 15 U.S.C. § 1125, and the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2.  Judgment shall be entered in favor on CFC on TCI's claim for attorneys' fees under 35 U.S.C. § 285.


SO ORDERED.


_____
Steven J. McAuliffe
United States District Judge

March 29, 1996

cc:  William L. Chapman, Esq.
     Robert W. Upton, II, Esq.
     Maurice E. Gauthier, Esq.
     Sibley P. Reppert, Esq.
     Edward V. Filardi, Esq.